## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 16 2020, 9:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Samuel J. Beasley
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Catherine Brizzi
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joel E. Taylor,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | December 16, 2020<br><br>Court of Appeals Case No.<br>20A-CR-1252<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Marianne L. Vorhees, Judge<br><br>Trial Court Cause No.<br>18C01-1807-F6-523 |

**Brown, Judge.**

[1]  Joel E. Taylor appeals his conviction for stalking as a level 6 felony and asserts the evidence is insufficient to sustain his conviction.  We affirm.

## Facts and Procedural History

[2]  Taylor and A.D. met in 2004 and had two children who were born in 2005 and 2006.  Taylor and A.D. did not live with each other and their relationship was "really off and on."  Transcript Volume II at 73.  According to A.D., Taylor was involved with the children when he was seeing her but did not take any initiative when the relationship was off.  Taylor and A.D. were together from about 2007 until 2009, and Taylor moved to Arizona in 2009 or 2010.  A.D. changed her locks, phone number, and email addresses.  Taylor visited Indiana in 2011, broke into her residence, found a pregnancy test, and left a note stating "this better not be yours."[1]  *Id*. at 78.  In 2016, Taylor sent A.D. Facebook messages, and A.D. sent a message to Taylor stating: "I got a protective order from you for a reason . . . I want NOTHING to do with you!"  Exhibits Volume II at 103.  A.D. blocked Taylor from contacting her, and he created new accounts to contact her.  From approximately May 2017 through January 2018, Taylor sent numerous handwritten letters to A.D. from a prison in Arizona.

[3]  In early 2018, Taylor started to email A.D. at an old AOL account and send her Facebook messages.  On February 2, 2018, Taylor sent A.D. a message stating

---

[1] A.D. sought and was granted a protective order but did not believe it was served on Taylor.

"[w]ish you wouldst [sic] have blocked me . . . Frustrating," and A.D. replied asking if he was out of prison. Exhibits Volume I at 6. According to A.D., she wanted to know if Taylor was out of prison because she was scared and "dreaded it" and she hoped he stayed in Arizona. Transcript Volume II at 89. Taylor sent A.D. approximately 200 messages during 2018 including email and Facebook messages from multiple accounts.[2] Some of the messages were sexual in nature and included photographs of male genitalia. Taylor sent A.D. a message on April 4, 2018, stating: "You have no clue what I could do! 2 U I know something about you . . . Every bit of you ear to toe . . . It's been banging in my head for years." Exhibits Volume I at 30. He sent her a message on May 17, 2018, stating "better not involve cops" and: "When I get there you had better jump up on me like a monkey jumping from a tree! If you ask me to leave I'll park down the street and camp out front. It won't be easy for you to get rid of. I'll get what I wanted and an understanding of what is life at very [sic] point. I hope to read it in your eyes." *Id*. at 40. Taylor sent a message to A.D. on May 27, 2018, stating "Look I am so f---ing excited to have my life back. I am free to do as I please. I am starting in your front yard. Period. Option is yours. I will not fight with you. . . . Either way you deserve me and I want to make myself of available . . . ." *Id*. at 57. He sent a message to her on May 31, 2018, stating "I know you say you don't want anything to do with me

---

[2] The prosecutor indicated that State's Exhibit No. 2 showed 206 pages of emails, and A.D. indicated there were other emails which were not included in the exhibit. When asked if the Facebook messages were "mainly geared towards you or to the children," A.D. testified "mainly towards me." Transcript Volume I at 87.

and I hope it changes. I seriously can't blame you, I was a loose cannon with no foresight." *Id*. at 58. He sent her a message on June 6, 2018, stating "I am coming and god knows I'm coming as strong as I can. . . . God I hope I can get to your heart again. I'll die before I ignore you for life." *Id*. at 82. He sent her a message on June 20, 2018, stating "I am coming and if you think not, you're surely mistaken," "I will not push myself on you. If you want me woman I'm here. You have the choice of me take it or leave it. I will not commit to another relationship until I see you and you tell me otherwise," and "I do not and will not live in Fort Wayne as I will return to a fist full of rage at any given point. Understand me and don't fight. I am sincere. You are my last love and I'll never stop loving you regardless how much a bi--- you may be to me." *Id*. at 132. He sent her a message on June 28, 2018, stating "[y]ou had better lose any ideas of court cops and or ni----- in the bushes!" *Id*. at 147.

[4] After receiving numerous messages from Taylor, A.D. sent a message to Taylor on July 9, 2018, stating: "Listen here you psychotic f---! Evidently ignoring your thousands of messages didn't give you the hint . . . . I'll say it one more time! LEAVE. ME. THE. F---. ALONE! You are not welcome here. The second you show up, the cops will be called. I want absolutely NOTHING to do with you. . . . Find somebody else to harass and stalk!!! Your obsession with me is sick and I want you to GO THE F--- AWAY!" Exhibits Volume II at 169. After sending the message, A.D. applied for a protective order. Taylor sent a number of additional messages to A.D. on July 10 through 16, 2018. He sent messages to her on July 14, 2018, stating "[u]nblock me Asshole!" and

"[o]ne day you will unblock me. Quit trippin! I didn't put nothing on there to get blocked. . . ." Exhibits Volume I at 175, 179. A.D. received a notification from the court on July 17, 2018, indicating her request for a protective order was granted and listing the cause number, and A.D. forwarded the court's message to Taylor. Taylor sent numerous messages to A.D. on July 19 and 20, 2018. On July 19, 2018, he sent her a message stating "I'll be by in like 2 days. This is f---ing extreme isn't it. You'd let the cops arrest me??? Really??? What happened to you???," another message stating "[a]m I not good enough for a 5 minute conversation? I mean come on," and another message stating "[c]an't believe you would ever step to that length . . . All bad. Never ever. I thought all wrong and was completely baffled by this sh--. Guess I have to go to court. Fun fun fun all over again just for your ass." *Id*. at 193-194, 196.

[5] On July 20, 2018, A.D. and her mother discovered bags of groceries, a bottle of tequila, a shot glass, a phone, and a handwritten letter from Taylor on the steps to their residence. Taylor sent an email to A.D. on July 20, 2018, stating "[w]hat evil did I do to you?? . . . you even have your mom talking sh-- to me???? For what. you deserve the bi--- word." *Id*. at 201. He sent a message to her on July 22, 2018, stating "[p]lease speak with me" and "I believe I have done a great deal to earn a simple visit . . . just for someone to lock the door in your face. Why not speak with me." *Id*. at 203. He sent a message on July 24, 2018, stating "I am stronger than any man you'll ever have. I'm not giving up on you. . . . I'm coming down. I'll email before I leave. Or tell me a good time. Please don't make me go to court." *Id*. at 204. On July 24, 2018, A.D.

met with a detective and provided a statement. Taylor sent a message to A.D. on July 25, 2018, stating "[t]his is not at all what I had planned. . . . I am putting these little dirt bikes together with final little touches. . . . I hope you find a little room to enjoy my company for a second tomorrow. If I can stay I will. If not that's fine. I can go shortly but I'd like to hang out if possible with them and get to hear their stories. . . . I'm trying to be cool and hold my wants back and complete my needs. . . . See you tomorrow ok I'm accepting it." *Id.* at 206. That day, A.D. replied stating: "When?"[3] *Id.* at 207. He replied indicating "probably ten ish." *Id.* at 210.

[6]     On July 26, 2018, Taylor arrived at A.D.'s home in a van and started to take bicycles out for the children, A.D.'s mother told him to leave and that he was in violation of the protective order, Taylor said that he was not leaving until he was able to see everybody, and A.D.'s mother called the police. The police responded to the residence and found Taylor in the driveway, Taylor indicated to the officer that he thought a protective order was in place, the police detained him, and A.D.'s mother had Taylor's van towed.

[7]     On July 31, 2018, the State charged Taylor with: Count I, stalking A.D. between January 1, 2017, and December 31, 2017, as a level 6 felony; and Count II, stalking A.D. between January 1, 2018, and July 26, 2018, as a level 6

---

[3] A.D. indicated this was one of the few times she responded; that she agreed with the analogy that, if she were in a body of water which she knew to be full of sharks, she would rather see the fins than not see them; and that it was worse for her to not know where Taylor was.

felony. Following a bench trial, the court found Taylor not guilty on Count I and guilty on Count II. In its written order, the court stated that it reviewed all of the physical evidence which included over 400 pages showing text messages, photographs, images, emails, letters, Facebook messages, and AOL messages. As to Count II, the court found that Taylor was placed on notice that A.D. did not want further contact with him and he repeatedly contacted her "in an impermissible way (she said to leave her alone)" and "in a way that would cause a reasonable person to suffer emotional distress (i.e., sexually explicit messages)." Appellant's Appendix Volume II at 79. In finding the State met its burden of proof as to Count II, the court found "it is clear [Taylor's] contacts went far beyond social niceties" and his "communications went far beyond demonstrating a desire to rekindle his relationship with the children," and the court stated it could "infer from the evidence in the case a specific intent by [Taylor] to engage in a course of conduct that would frighten or intimidate A.D. into acceding to re-enter a relationship with him, a relationship that would include a sexual component." *Id.* at 80. The court found that Taylor knew A.D. did not want to communicate or have a relationship with him, that A.D. continued to block Taylor from her social media, that he kept creating new accounts to contact her, and that A.D. blocked Taylor from using at least thirty Facebook accounts to contact her. The court further found that "[i]t is clear the contact actually caused A.D. to feel terrorized, frightened, intimidated, and threatened" and noted the testimony of A.D.'s mother and A.D.'s appearance and demeanor while testifying. *Id.* at 81. The court noted Taylor's

extensive history of felony convictions, offenses while on bond in this case, and prior placement on probation, and sentenced him to thirty months.

### *Discussion*

[8] In reviewing the sufficiency of the evidence, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the factfinder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* We will affirm unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* at 147.

[9] Taylor asserts the evidence does not show he specifically intended to cause A.D. to feel afraid, terrorized, intimidated, or threatened and actually proves that he intended the opposite to occur. He states he had an "on again, off again" relationship with A.D. and argues he "may be guilty of lacking in insight and being overly persistent – perhaps [he] remained optimistic that A.D. would change her position on the relationship front beyond when he should have resigned himself to the permanency of her disinterest. But being obtuse is not a crime." Appellant's Brief at 9, 17. He also argues: "What is more, where the object of one's affections does not feel similarly, it is not known that persistence will cause the other to feel fear or terror; oftentimes in such matters, persistence pays off! How many famous works in literature, film, etc. hail the virtues of the would-be lover who refused to give up? They are too many to count." *Id.* at

17-18. He argues he "was sincerely ignorant of how this all affected A.D." *Id.* at 18.

[10] Ind. Code § 35-45-10-5 provides that a person who stalks another person commits stalking as a level 6 felony. Ind. Code § 35-45-10-1 provides that "stalk" means "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened" and "[t]he term does not include statutorily or constitutionally protected activity." Ind. Code § 35-45-10-2 provides that "harassment" means "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress" and the term "does not include statutorily or constitutionally protected activity, such as lawful picketing pursuant to labor disputes or lawful employer-related activities pursuant to labor disputes." Ind. Code § 35-45-10-3 provided at the time that "'impermissible contact' includes but is not limited to knowingly or intentionally following or pursuing the victim." (Subsequently amended by Pub. L. No. 266-2019, § 14 (eff. July 1, 2019)).

[11] "[S]talking requires proof that the perpetrator entertained the intent to cause the other person to feel terrorized, frightened, intimidated, or threatened." *Burton v. State*, 665 N.E.2d 924, 927 (Ind. Ct. App. 1996). "[T]he requirement of a knowing or intentional course of conduct involving repeated or continuing

harassment directed toward the victim is a requirement of specific intent." *Johnson v. State*, 648 N.E.2d 666, 670 (Ind. Ct. App. 1995). "The State need not establish by direct evidence that an individual possessed a specific intent; circumstantial evidence will suffice." *Johnson v. State*, 605 N.E.2d 762, 765 (Ind. Ct. App. 1992), *trans. denied*.

[12] The record reveals that A.D. sent messages to Taylor indicating that she did not want to have a relationship with him and requesting that he stop contacting her. Nevertheless, Taylor sent her numerous email, Facebook, and AOL messages in 2018. The trial court observed "the messages in this case are voluminous" and stated that it was "looking at the qualities of the messages, not the quantity." Appellant's Appendix Volume II at 78 n.3. The court found that Taylor was placed on notice and told several times that A.D. did want contact with him, he repeatedly contacted her in a way that would cause a reasonable person to suffer emotional distress, it was reasonable for A.D. to feel terrorized or threatened, there were repeated impermissible contacts, and it was clear the contact actually caused A.D. to feel terrorized, frightened, intimidated, and threatened. It found that "A.D. continued to block [Taylor] from her social media, and he kept creating new accounts to contact her." *Id*. at 81. In addition, the court specifically found that, "[a]s to the proof of [Taylor's] specific intent, . . . [his] communications went far beyond demonstrating a desire to rekindle his relationship with the children" and that it could "infer from the evidence in the case a specific intent by [Taylor] to engage in a course of conduct that would frighten or intimidate A.D. into acceding to re-enter a

relationship with him, a relationship that would include a sexual component."
*Id.* at 80. The court reviewed Taylor's numerous messages to A.D. and heard the testimony of A.D. and her mother. The court heard testimony that A.D. and her mother discovered a handwritten letter from Taylor together with other items at their residence on July 20, 2018, and that Taylor again visited the residence on July 26, 2018, said that he was not leaving until he was able to see everybody, and was present when the police arrived. A.D. testified at length regarding Taylor's repeated communication and contacts with her, including his visits to her residence, and the court was able to observe her demeanor and assess her credibility. The trial court could reasonably infer from the evidence that Taylor's conduct constituted repeated or continuing harassment that would cause a reasonable person to feel, and that actually caused A.D. to feel, terrorized, frightened, intimidated, or threatened.

[13] Based on the evidence set forth above and in the record, we conclude the State presented evidence of a probative nature from which the trier of fact could find beyond a reasonable doubt that Taylor committed stalking as a level 6 felony.

[14] For the foregoing reasons, we affirm Taylor's conviction for stalking as a level 6 felony.

[15] Affirmed.

Vaidik, J., and Pyle, J., concur.